Filed 3/9/23  In re R.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNADINO COUNTY CHILDREN AND FAMILY SERVICES, | E079457 |
| Plaintiff and Respondent, v. | (Super.Ct.Nos. J290883 & J291348) |
| T.B., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynne M. Poncin, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, David R. Guardado, Deputy County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

1

While pregnant with B.B., T.B. (Mother) barricaded herself and her 10-month-old son, R.B., inside a gas station bathroom. Mother, who had been diagnosed with paranoid schizophrenia, bipolar disorder, anxiety disorder, attention deficit hyperactivity disorder (ADHD), and posttraumatic stress disorder (PTSD), violently attacked sheriff's deputies before being subdued and transported to the hospital, where she was detained for psychiatric assessment and treatment pursuant to Welfare and Institutions Code section 5150. (Unlabeled statutory citations are to this code.) R.B. was taken to the Loma Linda University Children's Hospital, where examination revealed a large skull fracture, a healing fracture of the right clavicle, and abrasions on his left shoulder. The forensic pediatrician's report stated that at least one of R.B.'s injuries "would have been noted by a reasonable caregiver" and that "there are several unexplained injuries for which medical care was not reportedly sought," which is "suspicious for child abuse and severe neglect." R.B. was detained from his parents.[1] When B.B. was born five weeks later, he was also detained from Mother. The juvenile court sustained dependency petitions as to both children, removed both children, denied reunification services, found visitation would be detrimental, and set a section 366.26 hearing. Mother appeared for the first time at the section 366.26 hearing but declined the court's offer for her to testify at a contested hearing. The court terminated parental rights and selected adoption as the permanent plan for both children.

---

[1] The fathers are not parties to this appeal and are discussed only insofar as relevant to Mother's appeal.

On appeal, Mother argues that: (1) her due process rights were violated by the failure to appoint counsel before the section 366.26 hearing; (2) she was not provided notice of her right to seek review by writ petition when the section 366.26 hearing was set; (3) she is not an offending parent and therefore could not be denied reunification services under subdivision (b)(5), (b)(6), or (b)(7) of section 361.5; (4) the juvenile court abused its discretion by denying her visitation; and (5) San Bernardino County Children and Family Services (CFS) failed to discharge its duty of inquiry under California statutes implementing the Indian Child Welfare Act of 1978 (ICWA). We conclude that Mother's arguments lack merit and therefore affirm the order terminating parental rights.

## BACKGROUND

On the morning of October 11, 2021, sheriff's deputies responded to a service call requesting a welfare check for Mother and her 10-month-old son, R.B. Mother was homeless and apparently experiencing a mental health crisis when she barricaded herself and R.B. inside a gas station restroom and stopped responding to the gas station attendant, who notified police. Mother appeared to be in an altered state, was "'combative and uncooperative,'" refused to exit the restroom, and slammed the door shut after deputies forced it open. One deputy observed Mother push the stroller, with R.B. in it, into a wall, but R.B. was not hurt. Mother punched, kicked, and hit the deputies. One of the deputies deployed a taser, which failed to subdue Mother, who then attempted to grab the taser from the deputy. Mother was eventually subdued, arrested on charges of felony battery against a peace officer engaged in the performance of his or her

3

duties (Pen. Code, § 243, subd. (c)(2)) and obstructing or resisting an officer (*id*., § 69, subd. (a)), and transported to the West Valley Detention Center. At the time of the incident, Mother was 32 weeks pregnant with B.B. Mother "was not booked at a detention center for her charges" but was advised charges would be referred to the district attorney for filing. She was "released to Arrowhead Regional Medical Center [ARMC] for further medical evaluation for her pregnancy." Mother was detained on a 72-hour psychiatric hold and admitted to ARMC's behavioral health unit for evaluation and treatment. (§ 5150.)

Law enforcement contacted CFS to take custody of R.B. after Mother refused to provide the names or contact information for R.B.'s father or any other family member who could care for the child. A CFS investigation eight months earlier had noted that Mother had been diagnosed with paranoid schizophrenia, bipolar disorder, anxiety disorder, ADHD, and PTSD. Her psychiatrist had "informed the social worker that her only concern for [M]other caring for the baby would be if [M]other stopped receiving mental health services" and that Mother "is only compliant with her treatment because of the open referral with CFS."

R.B. was taken to the emergency room at Loma Linda University Children's Hospital to be examined for possible injuries. X-rays and a CT scan revealed R.B. had a large skull fracture at the back of the head, which was determined to be "old" because there was no swelling of the scalp or intracranial hemorrhage; no precise date of injury could be determined. R.B. was also found to have a healing fracture of the right clavicle

4

and parallel abrasions on his left shoulder. The forensic pediatrician's report stated that at least one of R.B.'s injuries "would have been noted by a reasonable caregiver" and that "there are several unexplained injuries for which medical care was not reportedly sought," which is "suspicious for child abuse and severe neglect." The report also noted that R.B. had eye surgery scheduled four months earlier to remove cataracts, but Mother cancelled the surgery and never rescheduled. Failure to remove pediatric cataracts can lead to permanent blindness.

The following day, a CFS social worker received a call from a maternal aunt, Amber, stating that Mother had been released by law enforcement and admitted to ARMC. The social worker spoke with Mother's nurse, who confirmed that Mother had been admitted "on a 5150 hold with an unknown discharge date" and was awaiting transportation to another hospital. The nurse reported Mother was "'somewhat lucid but mostly delusional.'" The nurse confirmed that Mother "is aware that her child is in CFS custody" and agreed to provide Mother with the social worker's contact information and notice of the detention hearing. Mother called the social worker later that evening, talked about "'some people trying to get'" Mother and R.B., and refused to provide R.B.'s father's contact information. When asked about R.B.'s skull and clavicle fractures, Mother immediately denied causing the injuries and said maternal aunt, Amber, must have done it. Mother became agitated and yelled, "'I didn't abuse my baby!'" She then hung up the phone.

Mother was not present at the October 14, 2021, detention hearing. The juvenile court found notice had been given as required by law, ordered R.B. detained from his parents, authorized further forensic examination of R.B. by the Children's Assessment Center, found visitation to be detrimental, and therefore suspended visitation pending the jurisdiction and disposition hearing, which the court set for November 4, 2021.

On October 30, 2021, Mother confirmed to the CFS social worker that she had received notice of the November 4 jurisdiction and disposition hearing. Mother reported that she was staying in a hotel and provided the address. Mother again refused to provide any information regarding relatives, hung up on the social worker, and did not respond to the social worker's subsequent call or text.

Mother was not present at the jurisdiction and disposition hearing on November 4, 2021. The matter was continued to November 30 to obtain the reports from the Children's Assessment Center.

In November 2021, Mother gave birth to B.B. Hospital staff reported Mother was exhibiting symptoms of untreated psychiatric illness and refusing to allow any staff to touch B.B. or to take him to the neonatal intensive care unit (NICU). Staff referred to Mother as a "'frequent flyer'" at the hospital because of her history of psychiatric illness and refusal to take medication. Hospital security reported that Mother had been in and out of the hospital for mental health problems frequently in the past month, including a section 5150 hold three weeks earlier, and that she had a history of being physically and verbally aggressive, physically attacking staff, and not taking her psychiatric medication.

The CFS social worker documented a bruise on B.B.'s lower back, which the nurse said Mother may have caused by holding the child too tightly while refusing to allow staff to assist with feeding or take B.B. to the NICU. A nurse reported Mother had been observed walking around her room naked and bleeding and then squatting over a bedpan and urinating into it, all while holding B.B.

When interviewed by the social worker, Mother had difficulty providing responsive information and stated she was "'confused.'" The social worker observed that Mother's "thoughts did not always make sense and she would often change topic, stop talking and stare off, and start talking again." Mother denied taking any medication and denied drug or alcohol use. At one point, Mother said she was living in a "'studio.'" Later she reported living in a hotel, and she also reported living in a sober living facility because she was homeless. Mother identified B.B.'s father as "Dante B." but stated that "Dante" is his nickname, and it was "'not safe'" to give his first name. She could not provide his phone number, address, or date of birth. At one point, Mother stated that R.B. was next door at a hotel.

The following day, a detention warrant for B.B. and notice of the detention hearing were personally served on Mother. The social worker showed Mother the warrant, explained that a judge had authorized B.B.'s removal, showed Mother the date, time, and location of the detention hearing, and reiterated several times the importance of attending the hearing. Mother stated she was not on a section 5150 hold and knew where

the court was located. Mother again did not provide any information regarding relatives who could be assessed for placement.

Mother was not present at the detention hearing for B.B. on November 23, 2021. The juvenile court detained B.B. and found that visitation would be detrimental.

The jurisdiction and disposition hearings for the two children were combined and continued several times. On January 20, 2022, CFS reported that there had been no contact with the parents and their whereabouts were unknown. The juvenile court continued that day's hearing to allow CFS to file a declaration of due diligence describing its efforts to locate Mother and provide her notice of the hearing.

That day, Mother called the CFS social worker. She sounded "distraught" and reported "going through a breakdown." Mother confirmed that she had received notice of the jurisdiction and disposition hearing but could not make it to court. When asked about relatives who could be assessed, Mother stated she had no relatives in California other than her sister, Amber. She reported that Amber had stolen her belongings, kicked her out, and put the child at risk. Mother stated she got into multiple fights with Amber in the presence of R.B. She said that R.B. was injured when Amber hit him on the head twice during the fights, but Mother did not take the child to the hospital or call the police. Mother reported she had a brother, Trey, and "other sisters and family" in Baltimore, but she did not provide any additional contact information.

Mother provided a phone number for Amber that was not a working number. CFS had received a single phone call from Amber on October 12, 2021, reporting that Mother was hospitalized, but had received no contact from her since. CFS ruled out Amber for placement because of her criminal and CFS history as well as Mother's report of domestic disputes in the child's presence.

CFS filed a declaration of due diligence showing notice of the hearing had been sent by certified mail to all five of the possible addresses for Mother it had found. Mother was not present for the continued jurisdiction and disposition hearing held February 18, 2022. As to R.B., the juvenile court found all of the petition's allegations true and found he came within section 300, subdivisions (a) (physical abuse), (b) (neglect), (e) (severe physical abuse of a child under age five), and (g) (no provision for support). As to B.B., the court found all the allegations true and found B.B. came within section 300, subdivisions (b) (neglect), (g) (no provision for support), and (j) (sibling abuse). The court denied reunification services to Mother under section 361.5, subdivisions (b)(5), (b)(6), and (b)(7). The court found visitation would be harmful to the children's safety or emotional well-being. The clerk's office was ordered to provide advisement of the right to seek review by petition for extraordinary writ pursuant to section 366.26, subdivision (*l*)(3)(ii). The clerk's proof of service filed February 22, 2022, identified Mother's last known address as "unknown."

9

On March 2, 2022, Mother was personally served with notice of the section 366.26 hearing set for June 20, 2022. Mother appeared with counsel at that hearing. In response to the court's inquiry regarding possible Indian ancestry, Mother stated she may be a member of a tribe, but she could not identify which tribe. Mother stated her sister, Keia, may have more information regarding Indian ancestry, but Mother could not provide a phone number or other contact information for her sister. The court ordered Mother to provide Keia's contact information to the social worker by the next court hearing.

At the continued hearing on July 27, 2022, Mother stated she did not have any contact information for her sister, Keia. The juvenile court found that CFS had complied with its duty of inquiry pursuant to subdivision (i)(2) of section 224.2 and rule 5.481(b)(3)(a) of the California Rules of Court and that ICWA did not apply to the children. Mother's counsel requested that Mother be provided reunification services and that the section 366.26 hearing be continued and set as contested, or in the alternative, that the court select a permanent plan of guardianship without terminating parental rights. The court denied Mother's requests for services and a continuance but offered to proceed with a contested hearing if Mother wished to testify, but Mother declined. The juvenile court found the children likely to be adopted, terminated parental rights, and selected adoption as the permanent plan for both children.

## DISCUSSION

### A. Appointment of Counsel

Mother argues that she was denied due process because the juvenile court failed to appoint counsel for her until the section 366.26 hearing. We disagree.

Under California law, a juvenile court's duty to appoint counsel for an indigent parent in a dependency proceeding is triggered only if there has been "some manifestation by the indigent parent that he or she wants representation." (*In re Ebony W.* (1996) 47 Cal.App.4th 1643, 1647.) If the parent fails to appear at any hearings, does not request counsel, and has not otherwise manifested any interest in having counsel appointed, the juvenile court has no obligation to appoint counsel. (*Id*. at p. 1648; accord *Janet O. v. Superior Court* (1996) 42 Cal.App.4th 1058, 1064-1066.)

Likewise, when the United States Supreme Court in *Lassiter v. Department of Social Services of Durham County*, *North Carolina* (1981) 452 U.S. 18 first recognized that due process may in some circumstances require the appointment of counsel to an indigent parent whose parental rights may be terminated, the court acknowledged that "a court deciding whether due process requires the appointment of counsel need not ignore a parent's plain demonstration that she is not interested in attending a hearing," nor her "failure to make an effort to contest the termination proceeding." (*Id.* at p. 33.)

Accordingly, the right of an indigent parent to be represented by appointed counsel in dependency proceedings is generally not triggered until "that parent 'appears and requests such appointment *or otherwise communicates to the court such a desire*.'"

(*In re Andrew M*. (2020) 46 Cal.App.5th 859, 864-865 (*Andrew M*.) quoting Seiser &

Kumli, Cal. Juvenile Courts Practice and Procedures (2019) § 2.61.)

Here, Mother received notice but did not appear at any of the eight juvenile court

hearings before the section 366.26 hearing. She also did not contact the court to request

appointment of counsel or otherwise communicate to the court such a desire. The court

therefore was not required by statute or by due process to appoint counsel for her during

that period.

Mother contends that she was prevented from attending hearings by involuntary

hospitalizations, but the record does not support her claim. On October 11, 2021, Mother

was detained pursuant to section 5150 and admitted to ARMC's behavioral health unit

for evaluation and treatment. The following day, Mother's nurse confirmed that Mother

was "on a 5150 hold with an unknown discharge date, awaiting to be transported to

another hospital." Section 5150, however, allows for custodial evaluation and treatment

only "for a period not to exceed 72 hours." (§ 5151, subd. (a); see § 5152, subd. (a)

[requiring release "before 72 hours have elapsed" if the treating psychiatrist believes

evaluation or treatment is no longer required]).[2] Thus, Mother may have been prevented

from attending the October 14 detention hearing as to R.B. but the record contains no

---

[2] Although the initial 72-hour custodial period authorized by section 5150 may be extended under certain circumstances (see § 5250 [setting forth conditions under which a person, after having been detained for 72 hours under § 5150, "may be certified for not more than 14 days of intensive treatment"]), the record contains no evidence that Mother was ever subject to involuntary hospitalization beyond 72 hours.

12

evidence that Mother was involuntarily hospitalized on any of the other hearing dates at which she did not appear.

Mother asserts that on January 20, 2022, the date of the continued jurisdiction and disposition hearing, "Mother was also hospitalized but was still not appointed an attorney" but the record does not support Mother's contention.  Rather, Mother called the social worker on that date, apparently after the hearing.[3]  Mother sounded "distraught" and reported that "she has been going through a very rough time."  She reported that "'when I go to sleep at night, I don't remember anything in the morning, I have psychosis.'"  She also "reported she lost her phone, her ID was stolen along with her funds and identity," and she "reported being hospitalized at [ARMC] and maybe she is having a 'breakdown or postpartum.'"  She said that she "is just working to try and keep her housing and keep herse[l]f together."  Mother also "reported receiving the notice for court and stated she could not make court."  Although Mother mentioned hospitalization among many other events and issues, she never stated that she was hospitalized at that time and consequently unable to attend that day's hearing.  Mother's mention of hospitalization at ARMC may have referred to her October 11, 2021, section 5150 hold. In any event, the January 20 hearing was continued to February 18, 2022, whereupon

---

[3]  On January 20, 2021, CFS filed an "additional information to the court" advising that Mother's "whereabouts continue to be unknown" and that there had been no contact with any of the parents.  At the hearing that morning, CFS requested and was granted a continuance to February 18 to file a declaration of due diligence regarding its efforts to locate and serve Mother with notice as to B.B.  On February 18, CFS filed an "additional information to the court" advising of Mother's January 20, 2022, phone call.

Mother once again failed to appear, and Mother does not contend she was hospitalized or otherwise prevented from appearing on that date.

Mother's claim that she expressed a desire for appointed counsel in her communications with the social workers is similarly unsupported. Mother first contends that her desire to have counsel appointed was expressed in her October 30, 2021, phone call with the social worker because she repeatedly asked about the process to have her children returned to her care. In fact, the record describes the call as "very brief," stating that after the social worker had left a voicemail message, Mother called back to report she would be changing her telephone number. Although Mother reported she was staying at a hotel, she also said she had "'stable housing'" and demanded that CFS dispatch someone to verify her housing, insisted that CFS was required to inform her of R.B.'s whereabouts, and "continued to talk over" the social worker when she tried to respond. When the social worker was able to ask if there were any relatives who could be assessed for placement, Mother refused to provide any information, stating that R.B. is "my child, he only belongs to me, he doesn't belong to anyone else," before hanging up on the social worker. Mother failed to respond to the social worker's subsequent attempts to reach her. Although Mother stated in that call (and confirmed in the call on January 20, 2022) that she had received notice of the November 4, 2021, jurisdiction and disposition hearing, Mother did not inquire about the process for securing representation, did not express any desire to attend the hearing, and did not request transportation or any other assistance or accommodation in order to do so. Far from seeking the social worker's assistance,

14

Mother was hostile and uncooperative, talked over the social worker when she tried to respond, refused to provide information, and hung up on her.

Equally unavailing is Mother's further contention that when B.B. was detained, Mother again communicated her desire for counsel by telling the social worker that she wanted to be discharged from the hospital with her baby and did not understand why that was not permitted. Mother argues she "clearly wanted help with navigating the current removal of her children," and she faults the social worker for failing to "advise[] Mother of what steps she needed to do to help her situation other than to appear in court." The record shows that when the social worker tried to explain the detention warrant and notice of the detention hearing, Mother "would talk over [her] about a different random topic," including something that was "supposed to happen at 7:00 PM, about her clothing, and different people coming to visit her." Mother also complained about the hospital's security staff and their refusal to allow her to see B.B., and she said that she "would refuse to leave [the hospital] without her baby." Nothing in those communications with the social worker manifests a desire to have counsel appointed.

The cases Mother cites are all inapposite because they all involve parents who requested the appointment of counsel or whose appointed counsel were improperly relieved. (*In re J.P.* (2017) 15 Cal.App.5th 789, 793-794; *Andrew M.*, *supra*, 46 Cal.App.5th at p. 866; *In re Al.J.* (2019) 44 Cal.App.5th 652, 669; *Katheryn S. v. Superior Court* (2000) 82 Cal.App.4th 958, 970-971.) Again, Mother received notice,

did not attend hearings, and did not communicate or otherwise manifest a desire for representation.

We are mindful that Mother was suffering from untreated mental illness that undoubtedly affected her conduct, but we also note that Mother does not allege that her illness impaired her ability to understand the notice she received, the proceedings at which she failed to appear, or the consequences of her doing so.  (Cf. *In re Daniel S.* (2004) 115 Cal.App.4th 903, 910-911.)  For all of these reasons, we reject Mother's argument that the juvenile court erred by not appointing counsel for Mother until the section 366.26 hearing.

## B.  Failure to Seek Review by Extraordinary Writ

Mother argues that the court's dispositional orders denying reunification services and visitation are not supported by the record.  Mother's contentions are not cognizable on this appeal from the July 27, 2022, orders terminating her parental rights.

"An order by the court that a hearing pursuant to [section 366.26] be held is not appealable at any time unless" a timely writ petition was filed, which "substantively addressed the specific issues to be challenged and supported that challenge by an adequate record" and "was summarily denied or otherwise not decided on the merits." (§ 366.26, subds. (*l*)(1)(B), (*l*)(1)(C).)  "All court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 247.)  This "rule is the only way to ensure that all outstanding issues

16

will have been reviewed by the Court of Appeal prior to the section 366.26 hearing." (*In re Tabitha W*. (2006) 143 Cal.App.4th 811, 817.) Where, as here, reunification services are denied and a section 366.26 hearing is set at the disposition hearing, the juvenile court's findings and orders are reviewable, "if at all, only by way of a writ petition." (*In re Athena P*. (2002) 103 Cal.App.4th 617, 625.)

Mother contends her failure to seek writ review of the court's February 18, 2022, orders is excused because the juvenile court failed to provide notice of her right to do so. We disagree.

"When the court orders a hearing under . . . section 366.26, the court must advise all parties and, if present, the child's parent . . . that if the party wishes to preserve any right to review on appeal of the order setting the hearing under . . . section 366.26, the party is required to seek an extraordinary writ by filing a Notice of Intent to File Writ Petition and Request for Record (California Rules of Court, Rule 8.450) (form JV-820) or other notice of intent to file a writ petition and request for record and a Petition for Extraordinary Writ (California Rules of Court, Rules 8.452, 8.456) (form JV-825) or other petition for extraordinary writ." (Cal. Rules of Court, rule 5.590(b), italics omitted.) "If a party is not present when the court orders a hearing under section 366.26, within 24 hours of the hearing, the advisement must be made by the clerk of the court by first-class mail to the last known address of the party," must "include the time for filing a notice of intent to file a writ petition," and must be accompanied by forms JV-825 and JV-820. (*Id*., rule 5.590(b)(2)-(4).)

17

The failure to seek review by writ will be excused if the parent can demonstrate good cause by establishing that "the juvenile court did not adequately inform the parent of their right to file a writ petition." (*In re A.A.* (2016) 243 Cal.App.4th 1220, 1240 (*A.A.*).) "'In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend.'" (*In re Mia M.* (2022) 75 Cal.App.5th 792, 807.) Technical noncompliance with the advisement requirement does not determine whether the juvenile court has committed error. (*In re T.W.* (2011) 197 Cal.App.4th 723, 729-730.) What matters for purposes of assessing compliance with the written advisement requirement is whether the juvenile court sent notice "to an address where [the party] would likely receive it" (*A.A.*, at p. 1240). The burden is on the party seeking relief to establish "exceptional circumstances constituting good cause." (*In re A.H.* (2013) 218 Cal.App.4th 337, 348 (*A.H.*); accord *In re A.O.* (2015) 242 Cal.App.4th 145, 148.)

Here, the court ordered its clerk to mail the writ advisement to the parents' last known addresses, as required, but the clerk's proof of service states that Mother's last known address was unknown. Mother contends that was error because CFS had filed a declaration of due diligence the previous week indicating its search efforts had found five possible addresses for Mother. Mother misconstrues the record. Although CFS attempted on January 25, 2022, to serve Mother by certified mail at all five possible addresses, the record contains no evidence that any of those attempts was successful. On the contrary, the January 20 hearing was continued to allow for the filing of the

18

declaration of due diligence because Mother's whereabouts were then unknown. At the continued hearing, the court made findings—which Mother does not challenge—by clear and convincing evidence that reasonably diligent efforts were made in attempting to locate each child's absent parents, and those efforts were unsuccessful.

Subsequently, on March 2, 2022, Mother was located and personally served with notice of the section 366.26 hearing at a different address. We note the address indicated on the proof of service is the West Valley Detention Center, but nothing in the record suggests—and Mother does not contend—that Mother was at that location on February 18 or that the clerk could have mailed Mother the writ advisement at that address. When Mother first appeared and submitted a written notification of mailing address on June 20, 2022, she designated a different address that did not appear in the record previously. For all of these reasons, the court clerk lacked any "last known address" at which it could have mailed Mother the advisement where she was likely to receive it, and Mother has not established that her failure to receive the advisement was the result of any error by the court. (Cf. *A.H.*, *supra*, 218 Cal.App.4th at p. 347; *In re Rashad B*. (1999) 76 Cal.App.4th 442, 450 (*Rashad B.*).)

Mother relies on *In re Cathina W.* (1998) 68 Cal.App.4th 716 (*Cathina W.*), which held that the mother's failure to seek writ review was excused by the juvenile court's multiple errors in providing the advisement, including belated mailing, misadvising the mother of the deadline to seek writ review, and failing to re-send the advisement after it was returned to the court with a new forwarding address for the mother. (*Id*. at pp. 722-

723.)  The appellate court concluded that the mother had established good cause "because the juvenile court, through no fault of the mother, failed to discharge its duty to give her timely, correct notice."  (*Ibid*.)

Mother contends that because she "could not be present in court, a notice of current mailing address and the duty to keep the court and the Department informed was never conveyed to Mother," so she, like the mother in *Cathina W*., was deprived of the writ advisement through no fault of her own.  The argument lacks merit.  As explained in greater detail in the previous section, Mother has not established that she was unable to appear in court at any of the hearings other than the October 14, 2021, initial detention hearing for R.B.  The record thus does not support Mother's claim that she could not be present, and it therefore also fails to support her claim that her failure to receive the writ advisement was not her fault.

For similar reasons, *Rashad B*., on which Mother also relies, is distinguishable.  In that case, the juvenile court "made no attempt whatsoever to ascertain [the mother's] permanent mailing address" and "did not tell [her] that notices would be sent to the address so designated."  (*Rashad B*., *supra*, 76 Cal.App.4th at p. 450 & fn. 6.)  The present case is more similar to *A.H*., *supra*, which held the juvenile court's obligation to provide the writ advisement to the father was satisfied even though the notice had been returned as undeliverable, because the notice had been mailed to the address designated by the father, who had been provided form JV-140 containing "a clear advisement that each parent must file a new form to notify the court, clerk, and social services agency of a

20

change of permanent mailing address." (*A.H.*, *supra*, 218 Cal.App.4th at pp. 348-349; accord *In re J.R.* (2019) 42 Cal.App.5th 513, 528.) Although Mother here did not submit her mailing address in writing on form JV-140 until she finally appeared on June 20, 2022, she provided it to the social worker telephonically on October 30, 2021, after having received the form JV-140 advising her that notices would be mailed to the address she provided until she provided a new address.

Under the circumstances of this case—including Mother's failure to appear at multiple juvenile court hearings without explanation, her failure to respond to social workers' repeated calls and messages, her refusal to provide critical information when requested, and CFS's reasonable efforts to identify a mailing address for her—we cannot agree that Mother's failure to receive the writ advisement was attributable to an error of the court. (Cf. *Rashad B*., *supra*, 76 Cal.App.4th at p. 450.) We therefore conclude Mother has failed to establish extraordinary circumstances constituting good cause to excuse her failure to seek writ review. Her arguments concerning the court's dispositional findings and orders therefore are not cognizable on this appeal.

### C. ICWA Inquiry

#### a. Additional Facts

On October 12, 2021, in response to CFS's initial inquiry regarding R.B.'s possible Indian status, Mother indicated that her maternal great-grandmother (the children's great-great-grandmother) was or may have been Native American, but she could not provide any information to help identify either the great-great-grandmother or

21

the tribe. CFS reported Mother was asked about B.B.'s possible Indian status on November 18, 2021, but Mother was unable to provide information "due to her mental status." On December 7, 2021, a CFS social worker again attempted to contact Mother to "interview her regarding ICWA" and obtain contact information for any family members who may have relevant information, but the social worker was unable to make contact with Mother. The social worker was also unable to contact maternal aunt Amber and unable to obtain her contact information.

When Mother first appeared at the section 366.26 hearing, she was ordered to disclose identifying and contact information for all relatives of the children by completing the Family Find and ICWA Inquiry form (CFS-030). (See §§ 319, subd. (h)(3), 361.3, subd. (a)(8)(B).) Mother provided no information, leaving blank the sections asking for information regarding relatives for placement and the section seeking additional family contacts. She indicated she has or may have Native American ancestry, provided no information regarding the tribe or its geographic location, and provided only a first name, "Keia" and "MD" in the section requesting contact information for relatives who may have knowledge regarding Native American ancestry. On the Parental Notification of Indian Status form (ICWA-020), Mother checked the box indicating she is or may be a member of, or eligible for membership in, a federally recognized Indian tribe, and wrote "N/A" for the name of the tribe.

When questioned by the court, Mother stated she may be a member of a tribe but did not know the name of the tribe. When the court asked if there was anybody in her family who could provide information, Mother identified her sister Keia by first name only and said she did not have her phone number. Asked if there was any way to reach her sister, Mother replied, "I just need time." The court ordered Mother to provide her sister's contact information to the social worker before the next hearing date. At the continued hearing, however, Mother had not provided any additional information, and she reported she had none.

CFS explained to the court that all leads regarding the children's possible Indian status had been exhausted: "There is no further contact information that the department has in order to make any further inquiries. Mother has not named a tribe." Although Mother had suggested possible Indian ancestry, "it is so far back through the ancestry that it does appear to be family lore. She doesn't know the name of the relatives that far back."

### b. Legal Standards

Mother contends that CFS failed to discharge its duty of inquiry into the children's possible Indian status, so we should conditionally reverse and remand for further inquiry. The argument is meritless.

Congress enacted ICWA in 1978 to address "'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children

23

from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8 (*Isaiah W.*), quoting *Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32.)  ICWA declared that "it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ."  (25 U.S.C. § 1902; *In re Abbigail A.* (2016) 1 Cal.5th 83, 90 (*Abbigail A.*).)

California has "'incorporate[d] ICWA's requirements into California statutory law.'"  (*Abbigail A.*, *supra*, 1 Cal.5th at p. 91, quoting *In re W.B.* (2012) 55 Cal.4th 30, 52; see §§ 224-224.6.)  "[S]ection 224.3, subdivision (a) . . . provides that courts and county welfare departments 'have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . is to be, or has been, filed is or may be an Indian child in all dependency proceedings and in any juvenile wardship proceedings if the child is at risk of entering foster care or is in foster care.'"  (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9.)

Both CFS and the juvenile court "have an affirmative and continuing duty to inquire whether" a child who is the subject of a section 300 dependency petition "is or may be an Indian child."  (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)  An "Indian child" is defined as an unmarried person under age 18 who "is either (a) a

member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subd. (a).) The duty to inquire begins with the initial contact. (§ 224.2, subd. (a).) CFS "must ask the child, if the child is old enough, and the parents, Indian custodian, or legal guardians, extended family members, others who have an interest in the child, and where applicable the party reporting child abuse or neglect, whether the child is or may be an Indian child and whether the residence or domicile of the child, the parents, or Indian custodian is on a reservation or in an Alaska Native village." (Cal. Rules of Court, rule 5.481(a)(1); § 224.2, subd. (b).) The juvenile court must ask all participants at their first appearance whether they know or have reason to know the child is an Indian child, instruct the parties to inform the court if they receive information that provides reason to know the child is an Indian child, and order each parent, if available, to complete an ICWA-020. (Cal Rules of Court, rule 5.481(a)(2); § 224.2, subd. (c).)

If the initial inquiry provides "reason to believe" that an Indian child is involved in a section 300 proceeding, then CFS must "make further inquiry regarding the possible Indian status of the child," which includes "[i]nterviewing the parents, Indian custodian, and extended family members to gather the information required in" section 224.3, subdivision (a)(5). (§§ 224.2, subd. (e)(2)(A) & 224.3, subd. (a)(5); Cal. Rules of Court, rule 5.481(a)(4)(A).) "[R]eason to believe" is defined as "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).)

25

CFS also has a duty to document all inquiries undertaken and information received regarding the child's possible Indian status in its filings in the juvenile court. (Cal. Rules of Court, rule 5.481(a)(5).) The court, in turn, has a duty to ensure that CFS has discharged its duties of inquiry before the court enters a finding that ICWA does not apply. (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 320; *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431.) Because the duty of inquiry continues throughout the proceedings, the juvenile court must revisit any such finding if the court "subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry pursuant to Section 224.3." (§ 224.2, subd. (i)(2).)

### c. Analysis

Much of the discussion of the ICWA issue in the parties' briefs does not aid our analysis, because both parties rely almost entirely on cases that predate the 2019 and 2020 statutory amendments, discussed above, that expanded the duty of inquiry. Moreover, in addressing the issue of harmless error—that is, whether any possible inquiry error requires conditional reversal of the order terminating parental rights and remand for further inquiry—neither party cites the relevant test applied by this court.

In *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*), we explained that ICWA inquiry error will warrant conditional reversal and remand only where "the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Id.* at p. 744.) We recognize

26

that the courts of appeal are divided on how to determine if ICWA inquiry error is harmless, and our high court has granted review to resolve the issue (see *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578). Until it does so, however, we will continue to apply the test we articulated in *Benjamin M.* Under *Benjamin M.*'s "readily obtainable information" test, we find inquiry error is reversable and "require continued inquiry where the probability of obtaining meaningful information is reasonable in the context of ICWA." (*Benjamin M.*, at p. 744.) That is not the case here.

Mother argues that CFS failed to discharge its duty of initial inquiry because it failed to ask maternal aunt Amber about the children's possible Indian status, even though Amber "was interviewed for placement." Mother's argument is contradicted by the record, which does not indicate either that Amber was available for ICWA inquiry or that she is likely to possess relevant information.

Amber placed a single brief telephone call the day after the initial referral to inform a social worker that Mother had been released by law enforcement and was hospitalized. Mother refused to identify or provide contact information for Amber or any other relative when requested by law enforcement and again when requested by the social worker. More than three months later, after B.B. was detained, Mother "reported her sister, Amber is the only relative she had to place the child with," but the phone number Mother provided for Amber turned out not to be working. Although CFS was unable to contact Amber and received no further contact from her, the social worker nevertheless

27

conducted the criminal records check and check of allegations of prior child abuse or neglect required by section 361.4 and excluded her as an emergency placement because of the results. Contrary to Mother's contention, the record contains no evidence that CFS interviewed Amber when it conducted the records check, that CFS had any contact with Amber after receiving her single brief phone call on October 12, 2021, or that CFS had any ability to reach her. In addition, Mother did not name Amber when asked by the court if any family members may have information regarding possible Indian ancestry. Moreover, Amber is identified in the record as the children's "maternal half-aunt," which may indicate Amber is not biologically related to Mother's purported Native American maternal great-grandmother.

Mother argues that CFS failed to follow up after she told a social worker that she had a brother named Trey and other sisters and family living in Baltimore. The argument fails because the record contains no evidence that any of those purported extended family members—none of whom Mother even identified, other than providing Trey's first name—had any contact with CFS or were reasonably available for CFS to conduct any inquiries of them. (Cf. *In re Ricky R*. (2022) 82 Cal.App.5th 671, 680 [under *Benjamin M*., remand for further inquiry is required where the child welfare agency failed to inquire of extended family members who were "readily available"].)

Mother also points to a mention in the record that CFS was informed by the Baltimore child protective services (CPS) agency that Mother had a history with CPS as a juvenile and was adopted by her maternal aunt, whose parental rights were subsequently terminated. Mother argues that the unidentified maternal aunt is another extended family member whom CPS should have contacted to inquire regarding the children's possible Indian status. As with Amber and Trey, the record contains no evidence that the unidentified maternal aunt was "readily available" for CFS to make any such inquiry. Indeed, the information obtained from the Baltimore CPS agency indicates that Mother's biological mother and Mother's maternal aunt who became her adoptive mother both had their parental rights terminated as to Mother, and nothing suggests that Mother had any contact with them or knew how to reach them. There is consequently no evidence that they had "readily obtainable information that was likely to bear meaningfully" on the children's possible Indian status. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) When viewed together with Mother's inability to provide identifying or contact information for any relatives (other than the previously identified maternal half aunt Amber, for whom Mother had no working contact information), the inability to identify B.B.'s biological father, and inability to locate the person identified by Mother as R.B.'s biological father, the information from the Baltimore CPS agency does not undermine CFS's assertion that it had exhausted all available avenues of ICWA inquiry.

29

Mother also argues that the duty of further inquiry was triggered by her claim of Indian ancestry through her maternal great-grandmother, but CFS failed to initiate informal contact with any tribes, the Bureau of Indian Affairs, or the California Department of Social Services, as required by statute. We disagree because there was no meaningful additional investigation that CFS could have conducted. (*In re J.S.* (2021) 62 Cal.App.5th 678, 689 (*J.S.*).)

In *J.S.*, the paternal grandmother submitted ancestry.com DNA test results "indicat[ing] that she had approximately 54% Native American lineage/heritage," but the "results did not provide an associated tribe of descent." (*J.S.*, *supra*, 62 Cal.App.5th at p. 683.) The paternal grandmother did not believe any of her relatives were eligible for tribal enrollment and was unable to provide contact information for any relative who might know more about the family's potential Native American ancestry. (*Id*. at p. 684.) The appellate court held that to the extent paternal grandmother's information provided reason to believe that the proceeding involved an Indian child, the child welfare agency's investigation was proper and adequate. (*Id*. at p. 690.) "Without the identity of a tribe, let alone a federally recognized one, or at least a specific geographic area of possible ancestry origin, the Bureau of Indian Affairs (BIA) could not have assisted the Department in identifying the tribal agent for any relevant federally recognized tribes. [Citations.] Transmission of a notice to the BIA would have been an idle act. [Citation.] Without more information the Department also could not send notices to any tribes." (*Id*. at pp. 689-690.)

The same is true here.  Mother was unable to provide any identifying information for either the maternal great-great-grandmother, the tribe or tribes with which she may have been affiliated, or any available relative who may have additional relevant information.  Further inquiry requires contacting only those tribes "that may reasonably be expected to have information regarding the child's membership status or eligibility." (§ 224.2, subd. (e)(2)(B).)  But in this case, there are no such tribes.  Moreover, contacting the Bureau of Indian Affairs under these circumstances would be fruitless, so it would be unreasonable to interpret section 224.2 as requiring CFS to do so.  The cases Mother relies on do not compel a different conclusion, because in each of them the child welfare agency had information identifying the relevant tribe or tribes and had either biographical information relevant to a tribe's determination of membership or contact information for family members identified as having such information.  (See *In re T.G.* (2020) 58 Cal.App.5th 275, 292 [agency failed to pursue information concerning children's possible Cherokee ancestry]; *In re M.W.* (2020) 49 Cal.App.5th 1034, 1039-1040 [although father was initially unable to identify tribe, agency failed to pursue information from paternal grandfather identifying possible tribes as Apache and Navajo and location as Colorado]; *In re Josiah T*. (2021) 71 Cal.App.5th 388, 400-401 [agency failed to further inquire about child's possible Cherokee and Choctaw ancestry].)  Here, there was no family or tribal information on the basis of which CFS could have conducted any meaningful further inquiry, and there was no available family member

31

identified as having such information.  For all of these reasons, we conclude there was no violation of the duty of further inquiry.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

FIELDS
Acting P. J.

RAPHAEL
J.